We'll turn to the famous, famous problem in litigation. All right, we'll hear council in New York City District Council of Carpenters Against Trustees of the New York District Council of the Carpenters and Welfare Fund. Or it's and, versus Best Made Floors. May it please the court, my name is J. Michael Gottesman. I represent Best Made Floors in this action. Best Made Floors was a small business run from a basement office which installed floor coverings at commercial establishments. In accordance with the applicable agreements, my client paid union wages and union benefits for the seven hours that its workers worked. And they did not pay for an eighth hour that the worker was entitled to work, but elected not to work. My client was audited. As part of the audit, it gave the benefit division notice of a mail address, an email address, and a phone number. The audit was conducted. The audit found that my client had paid the hours that its workers worked, but it didn't pay for the eighth hour that the workers didn't work. In extensive email communication with the union benefit fund, my client was instructed how to proceed. To make a long story short, it secured affidavits for its employees that the union audit division said should be provided. Without going into details, the district court found that these affidavits had been accepted by the benefits division, the audit division. My client reasonably thought that the matter was resolved. For some reason, not disclosed in any declaration by any union person, these affidavits were rejected. The memorandum suggests questions of credibility, but if you're going to reject them based on credibility, why ask for them in the first place? It didn't make sense. Our position is that at minimum, my client was entitled to continuation of the process that the benefit division started. An email notice from the benefit division that the affidavits were rejected, that there was a certain amount due, and that there would be an arbitration if the amount was not paid. Can I ask you a question about the address? So I gather that the Secretary of State and the CBA, the 172 Division Street address or Division Avenue was stated as the place for formal notice. But you said that your client designated other addresses. Yes. I wasn't quite sure what that designation was. Was there formal notice given? Yes. Or was it just that you used certain email addresses? No, no, no. If you give me a minute, in the report of the accountants, it lists the address for mail service, for email service, for email. In the accountant report. In other words, it states that my clients had furnished those addresses at which it wanted. So they were designated in that way, but the CBA was never amended, and there was no provision in the CBA that allowed you to give a superseding notice address, right? Well, number one, the benefits were not party to the CBA. Number two, the CBA did not contain a formal designation of address. Number three, if you go by the CBA, the funds still didn't give adequate notice. The funds say that a receipt, if given, would provide a clear service, would establish notice without question. And if a certified mail was not refused or not picked up, then ordinary mail to that address would be sufficient. But that didn't happen in this case. There is no way that you can say that the mail that was undeliverable was not picked up. You can't say that it was refused. The Supreme Court in Jones v. Flower has made clear that when mail is marked undeliverable, it wasn't delivered. In other words, under the CBA, if you look at this, this is very important, under the CBA, if you look at the CBA, the CBA requires another effort, requires more than just a certified mail and ordinary mail. That's sufficient if it was rejected or not picked up. But that was not the case here. So it's not just due process or procedural due process, but the CBA itself recognized that the union had to do something else. And it's common sense. If a person gives you an address and you use that address, you use the email address to get in touch with the person, it's only common sense that if you really want to ---- Am I correct? I mean, there's an allegation that voicemail was left as well several days before the August 2016 hearing. Is that contested? Yes. My client didn't get it. It was left at a phone number that was used four years previously. In other words, instead of looking at the information that they had right in front of them, they just went on the Internet. They didn't even think that they were party to the CBA. And the CBA was just invented after or just resorted to after the fact. And what about the Secretary of State's designation of address that your client supplied it? Why wasn't that reasonable to rely on? Because that is used for service of process. It's not used, and it's used if the Secretary of State receives process and sends it out in a certain way. I don't know that they sent it out the same way as the Secretary of State. And what's more is if someone tells a union, listen, we want to be notified in this, this, and this way, okay? Even if they didn't change the collective bargaining agreement, they were having a problem receiving mail, and they advised the union, notify us at this address, notify us at this e-mail address. The union goes through the process, uses the e-mail address, and then stops right in the middle and doesn't give them any more notice by e-mail. The question is, why didn't the union use the method that it had used and the method that had been designated and approved by the union? And the union says one thing about the designated means of address. They said that was perfect service. Well, that's like saying, you know, I have a perfect way of serving you, but I can use inferior ways because the law doesn't require me to use a perfect way. If a person knows the exact way to serve someone, he has to use that way. He can't say, well, I'm going to defer to that one and use a less effective way. I just want to say one other thing on the second point. This is a case where the union misled and presented false information. I have to say that. They stated that my client got notice of the claim and didn't pay it. Now, that contains a clear implication that my client didn't respond to it, and that was false. Okay? My client responded to it. My client worked it out. And I submit that was part of the union's case, you know, as part of any good faith process. You know, that was their affirmative case to present the whole truth to the arbitrator. So I just want to say I see my time is running out. So I just want to say on the other award, on the first award, I know that this, you know, that the court has questions about fundamental fairness, applying to arbitration awards. I've become familiar with that. But we're not talking just about arbitrator misconduct here. We're talking about the union, no matter whose testimony you accept. The union's testimony said, well, Mr. Ahearn may not want to testify if he becomes aware that he's subject to violations if he admits violations. And what Oesterreicher said, he's going to be sanctioned if he testifies for best. There's little difference between the two in light of the fact that the district court said there was no way he could testify without admitting violations. So the unions didn't explain why they made that statement. Why were they trying to suppress his testimony? There's no question that that's what they were trying to do. And without regard to anything else, arbitration assumes that people are going to use their, are not going to misuse their power. This was a case where the union misused its power to sanction the only witness that could have resolved the issue of credibility, misused it. And I suppressed, and I submit, misused it in a very corrupting and serious manner. Thank you, Mr. Gottesman. You've reserved two minutes. I gave you an additional couple of minutes. Ms. Sigalakis? Good morning, your honors. May it please the court. My name is Lydia Sigalakis, and I just want to be clear. I'm here, I'm from Spivak Lipton. I'm here on behalf of the, there are two petitioners in this case, two appellees, the union and the funds. I'm here on behalf of the union. Mr. Gottesman conflates the two, the funds and the union are two separate legal entities. The union is, as its name suggests, a union run by 100% union officers. The funds is a multi-employer Taft Hartley Act, jointly trusted by employer and management. So it is a mischaracterization to refer to the funds as the division, benefit funds division of the union. They're separate legal entities. They have separate counsel. So on behalf of the union, we are here. The only, there's only one arbitration award before your honors, and that is the November 3rd, 2015 award for approximately $6,000 in wages and benefits on behalf of Jeffrey Tocque. I thought we had two. The second award has been, it's no longer before your honors. It's been replaced by a subsequent award that the union anticipates moving to confirm in the Eastern District. That's the June 10th. Correct. The June 10th, 2017 award. We know the June 10th award is not before us. Correct. But what about. The June 7th, 2016. Well, the June 10th award replaces the June 7th, 2016 award. Fine. Let's put that aside. Right. I had been under the impression that there were two others, two other awards, the November 3rd award and the August 15 award. The November 3rd award is the award in favor of floor-cover carpenter Jeffrey Tocque. That's the one that's before you. The August 15th, that's a funds award that has nothing to do with the union. That's the award that. But that's before the court. That's before the court. Correct. It's not your problem. Right. I'm just saying on behalf of the union, there's only one award. All right. So you would agree that as far as we're concerned, the judges on this panel, we've got two awards before us, November 3rd and August 15th. Correct. And I'm just speaking to the November 3rd award. So the union respectfully asks this court to affirm Judge Ross's ruling, which confirmed the November 3rd, 2015 award. The appellant failed to meet the extremely high burden that's required to defeat confirmation of an arbitration award. As your honors know, for over 50 years, it's been well established by the Supreme Court and this circuit, that labor awards are accorded an extremely high level of deference. And as recently as last year, in the NFL and Flategate case, your honors, the circuit said that the deference accorded to labor arbitration awards is among the most deferential in the law. What appellant is asking your honors to do is basically overturn over five decades of well-established law. The collective bargaining agreement says in black and white, the arbitrator's decision is final and binding. This is, I submit, a garden variety petition to confirm an arbitration award. The appellant attempts to change it into something other than that by mudslinging, attacking, accusing an arbitrator of being corrupt and extortion, alleging extortion that, as Judge Ross said, was not extortion. And to Mr. Gottesman's point that he made just this morning, alleging a threat of witness intimidation when indeed there was no such threat. He also points to the award that's since been corrected, that imposed $25,000 per incident, a fine on the union, and that mysteriously seems to have been reduced to 5,000, as opposed to a total of 10, as opposed to a total of 50. That is no longer before us, and I gather that doesn't prevent us from exercising jurisdiction here. But just as an evidentiary matter, it was a surprisingly high number. Could you explain why that doesn't help validate his claim of bias on behalf of the arbitrator? Certainly, Your Honor. The 2001 to 2006 collective bargaining agreement has a contractual penalty for cash payments without the proper documentation of $5,000. The subsequent collective bargaining agreement, 2011 to 2015, upped that penalty to $25,000. So regardless of what collective bargaining agreement the arbitrator was applying, as Judge Ross said, applying the $5,000 penalty could be per instance. We're talking multiple days of cash payments. So whether the arbitrator applied $5,000 per instance under the 2001 to 2006 collective bargaining agreement, or the $25,000 per individual, 25 for all of the cash payment violations to one employee, 25,000 total. The arbitrator didn't explain what he was doing, though, really. He just said, I have great confidence, and here's the $50,000 tab. Correct. He had confidence that the violation occurred. He did not explain the remedy, whether he was applying, which award he was applying. And the revised award, the union, to its detriment, the union did, acknowledging that perhaps Mr. Gottesman had an arguable case that the lower amount could fly. The union is not in the business of trying to wring as much money out of employers as possible. They are in the business of getting wages and benefits for work performed, which is why we could not budge on Jeffrey Tolk's case. I was a little horrified by the first part of your statement. You're not in the business of wringing as much money out of the employer as possible. No, we're not. We're in the business of getting what is due. And the union 100% agrees that the $50,000 penalty is fully supported by the contracts. But again, to its detriment, but in the interest of accommodation, we agreed to modify the award downward because, as Mr. Gottesman pointed out, arguably, either one could go. So that's why I say that award is not before your honors. But certainly, we could not be flexible downward when it comes to wages and benefits to an employee. So I just want to point out that the first, this sort of goes to the credibility of the whole claim of after-the-fact extortion and after-the-fact witness intimidation. The first anyone ever heard of such allegations is not after the award was issued, not even 90 days after the award was issued, which is the statutory period in which a person has the time to move to vacate a ward. The first time we ever heard these claims was, and I would say ad hominem attacks, was when the union moved to enforce the awards. And I think this really shows that in the absence of any meritorious case that Best Made Floors had, they decided to have mudslinging in the direction of the arbitrator and the union. I just want to quickly get to the point about the threats to sanction Best Made Floors witness Ahern. There was no threat to sanction Mr. Ahern at all. Best Made Floors, they could have called him. There was no reason for the arbitrator to order the union to call him. Best Made Floors could have subpoenaed him. They could have asked the arbitrator to issue a subpoena. They didn't. They could have subpoenaed him themselves. They did not. There was no reason for the union. And that's what the claim was. The claim was that the arbitrator should have ordered the union to produce this person. There's no way the union could have produced Mr. Ahern. He's not their employee. Mr. Sigelakis, let me ask you. You've heard Mr. Gottesman's rendition of various concerns. Were all of those issues considered by Judge Ross? What issues? Because most of his concerns were about the funds, notice, and all that kind of stuff. Any and all. Yeah. Were those considered by Judge Ross? I can't speak to the funds case. I can only speak to everything Mr. Gottesman said about notice and addresses. Let me put it another way. Okay. Did you personally appear before Judge Ross in this case? Yes, I did. Tell me what Judge Ross's proceedings, if any, were. Did she hold oral argument? Did she have an evidentiary hearing? No, she did not. Did not have which? She did not have oral argument. She did not have an evidentiary hearing. She correctly applied the highly deferential standard of review. She found that with regard to witness threats, she found that there was no evidence that there was any threat made to sanction Mr. Ahern in the abstract and certainly nothing that was even conveyed to him. She didn't even think it meant the facts warranted the threshold finding of having an evidentiary hearing, let alone vacating. Mindful of the existence of other appellees, I take your point. But with respect to anything that Mr. Gottesman might have argued before, earlier today, that has anything to do with the New York City District Council of Carpenters, were all of those issues before Judge Ross? Yes, they were, Your Honors. And decisions were well thought out and rightly decided. She considered all of the allegations and dismissed them as being without merit. She claimed that they were, I think, bald speculation is how she accurately described them. And that's what it is, falsehoods and speculation. Thank you very much. Mr. Gottesman is reserved two minutes. Thank you, Your Honors. There was nothing bold or speculative about the union's admission that after Mr. Ostreicher said he wanted Ahern to testify, the union stepped out and said, and came back, Mr. Ahern might not want to testify if he's going to be at risk of sanctions if he admitted technical violations. They were technical during his testimony. And Judge Ross found that he could not have testified without admitting those violations. So that's just a very genteel way of saying that Mr. Ahern is not going to want to testify because he would be at risk of sanctions. And contrary to what Ms. Sigalakis said, I have the greatest regard for her, and I just feel I have to say that, but contrary to what she said, the union had power over Ahern. They summoned him to one hearing where they wanted to find out about Ostreicher. They had power to produce Ahern. Did you ask him to appear? Did we ask him to appear? We did not ask him to appear because, consider, Your Honor, could Mr. Ostreicher have asked Ahern to appear without advising him of the union's position? Even the union's genteel position? Could he have done that? And why should Ahern have been willing to testify if he was subject to sanctions? The union, in this case, laid down the gauntlet, effectively making it impossible for Ahern to testify without fear of retribution. And arbitrators do have the power under the Federal Arbitration Act and under the CPLR to subpoena and compel witnesses to testify. And the union did not dispute until their very last brief, a serve-applied brief, that we asked the arbitrator to compel the union to produce Mr. Ahern without fear of retribution. If the union can conduct an arbitration in that manner, what's the sense of arbitrating? If you can't call your witnesses, what's the purpose of it all? Thanks, Mr. Gottfried. Thank you. We'll reserve decision, and we are adjourned. Court is adjourned.